## Phillips Petroleum Co. v. Cunningham et al.

March 9, 1943.

McMurry & Shoup, J. D. Via and Cecil Hunt for appellant.

M. C. Anderson and Nancy Day Montgomery for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Appellant, a corporation, and appellees, a partnership composed of W. M. Cunningham and R. G. Cunningham, doing business under the name of Cunningham Oil Company, are engaged in the distribution of petroleum and petroleum products and operating filling stations in Ballard, Carlisle, and Hickman counties, Kentucky. For several years previous to December 11, 1939, the Illinois Oil Company was likewise engaged in the same business in the same counties, and perhaps other adjacent or nearby counties, and maintained and supplied service stations at various points. It owned a "bulk plant" at Bardwell, Kentucky, from which it supplied various retail stations, some of which were owned by it and others owned by local merchants and operated in connection with stores and perhaps other business enterprises which it supplied with petroleum products under oral contracts.

In the latter part of the year 1939 the Illinois Oil Company had some negotiations with appellant looking to the sale of its products and equipment in that territory, but they failed to agree on the purchase price, but at a later date, December 11, 1939, it sold to appellees its property and business including the bulk plant at Bardwell, at a purchase price of $5,000. It appears that the Illinois Company had previously offered to sell to appellant, and perhaps others, the same property it sold to appellees, exclusive of the bulk plant at Bardswell, for $3,300. Soon after appellees purchased the property of the Illinois Company it contacted R. M. Copeland who had been the agent for the Illinois Company and offered to employ him to work for or represent them in the same territory in which he had formerly represented the Illinois Company, but they failed to agree on the salary. On the next day Copeland applied to appellant for a position with it, stating that he thought the accounts previously handled by him for the Illinois Company could be secured for appellant if it would employ him, which it did. Mr. Copeland, together with L. O. Scheer, a representative of appellant, immediately contacted the service station operators for the accounts, patronage and business connections which they formerly had with the Illinois Company and secured contracts with them to purchase products from appellant instead of appellees, who had purchased the interests of the Illinois Company. Ap-

pellant then began servicing these station operators using the gasoline tanks and equipment which had previously supplied the Illinois Company and which were included in the property sold by the latter company to appellees. After appellant had secured the contracts from these various operators, it sent letters to appellees advising them that appellant had secured contracts with these various operators and was servicing the accounts pending receipt of appellees' invoices for the pumps, tanks, etc., and further stated that if the price listed did not meet appellees' approval to so advise appellant by return mail and arrangements would be made to replace the equipment. Appellees wrote appellant attaching invoices for the equipment but appellant declined to pay the price asked. No further negotiations were had and appellees brought this suit in April, 1940, alleging the purchase of the property and business of the Illinois Company, and that in December, 1939, it was the owner of and in possession of the property and business pursuant to its purchase of the same from the Illinois Company and that appellant had wrongfully seized and converted the property, and because of such wrongful seizure and conversion it impliedly promised to pay for the same and prayed to recover of appellant the sum of $2,416.25, the alleged value of the property. It was further alleged that "the defendant in a high-handed and unlawful manner took possession of said property and converted it to their own use in the places where it was installed for use by these plaintiffs, in their competitive business and by their acts in this manner and by the said conversion these plaintiffs have sustained damages in the sum of $550.00, all of which is due to the wilful, wrongful, unlawful and high-handed actions as hereinabove set out of the defendant in the conversion of this property at the places where these plaintiffs had it for their use and for their acts in depriving these plaintiffs of the possession and use of the said property, which said damage of $550 is over and above the actual value of the property so converted by the defendant."

Appellant filed its answer denying that the value of the property converted was $2,416.25 and denied the alleged value of each item was itemized by appellees, but admitted that it converted a portion of the property specified in the petition, of a value of $1,077, and offered to confess judgment for that amount accompanied by a tender which appellees refused to accept. By agree-

ment of the parties a jury was waived and the law and facts submitted to the court and pursuant to a motion for a separation of law and facts the court made such separate findings and awarded judgment in favor of appellees in the sum of $2,365.75, representing the value of the property converted, but denied appellees' claim of $550 for the wrongful conversion, or, in a sense, punitive damages. Appellant has appealed from that part of the judgment over and above $1,077, the amount which it tendered in full satisfaction of the property, and appellees have cross-appealed from that part of the judgment disallowing extra or punitive damages for the conversion.

There are no questions of law involved. It is admitted by appellant that the court applied the proper measure of damages, namely, the fair market value of the property at the time and place of the conversion. It is insisted, however, that the evidence is insufficient to sustain the court's finding of values of the property or a part of it, and further, that the evidence is insufficient to show that the Illinois Oil Company owned two certain air compressors involved, one at Columbus, Kentucky, and the other at Lovelaceville, Kentucky, and did not sell the same to appellees, and hence no conversion of them by appellant. The parties are in agreement as to the value of the air compressors, the dispute going only to the ownership of them. Appellant also insists that the Illinois Oil Company did not own a certain truck tank involved, valued by appellees at $550, and by appellant at $200, and did not sell same to appellees and there was no conversion of it by appellant. It is not disputed that the truck upon which the tank was mounted belonged to R. M. Copeland but the chassis was painted red, the color of the Illinois Oil Company property, and it is described in the bill of sale by which the Illinois Oil Company sold all the equipment to appellees. R. M. Copeland testified that he offered to take the tank to Clinton and unload it and that Cunningham, one of the appellees, told him he would tell him when he was ready for it, and not being able to receive any definite directions from Cunningham he asked Mr. Scheer, a representative of appellant, what to do with the tank and Scheer told him to take it off the truck and mount one of appellant's tanks on it and that he did so and placed it in a garage at Bardwell and advised Cunningham where it

518

was located. He was further asked and answered these questions:

"Q. Do you remember a truck tank that you had used for the Illinois Oil Company and was sold to the Cunningham Oil Company? A. I do.

"Q. Did you use that tank for the Phillips Petroleum Company, if so, for how long? A. About two weeks.

"Q. For what purpose did you use it? A. Delivering and providing Phillips Petroleum products.

"Q. Where is that tank now? A. In Bardwell at the Shell garage.

"Q. Who stored it there? A. I did.

"Q. At whose instructions? A. Mr. Scheers.

"Q. Who is he? A. District Manager of the Phillips Petroleum Company."

On cross-examination Mr. Copeland testified as follows:

"Q. Whose truck was that tank on? A. Mine.

"Q. Your's personally? A. That is right.

"Q. At the time of the sale by the Illinois Oil Company to Cunningham, how did you know, or remember, that tank had been sold, if it had been sold? A. I was there—of course, when they checked with the Illinois Oil Company, I understood at that time, my Manager told me that was part of the equipment sold.

"Q. Did you have any conversation with Mr. Cunningham about that tank? A. Yes, at that time they were talking about it and Mr. Cunningham asked me if I could bring the tank to Clinton for him. I said I could and he offered a reasonable amount for delivery. I asked him when he wanted it delivered and he said, in a day or so, something like that; in the meantime I used it to deliver and after I connected with Phillips I delivered with it. I called him and asked him if he was ready for the tank and he said, not, and he never give me a good answer, and so Mr. Scheers instructed me to deliver it to the garage and store it."

Appellant admits that it used the tank two or three weeks while Copeland was awaiting instructions from Cunningham, but it was never repainted and still carries the colors and bears the name of the Illinois Oil Company. Mr. Scheer testified that he told Copeland that his company (appellant) did not want the tank and instructed Copeland to get it off the truck and put appellant's tank on the truck. R. G. Cunningham denies this arrangement and testified that they purchased the tank from the Illinois Oil Company through Copeland, who negotiated the sale, and that appellant used the tank in delivering its products to various places and customers for two or three weeks. He said that the tank was now at Bardwell but that neither he nor his partner, W. M. Cunningham, ordered it stored there. It appears from Mr. Copeland's evidence that he, as agent of the Illinois Company, sold the tank to appellees and used it in appellant's business after he was employed by it and then stored it at Bardwell at the direction of Mr. Scheer. It appears from Mr. Copeland's conversation with Cunningham that he treated the tank as being part of the equipment sold by him to appellees and he recognized appellees' ownership of the same. In regard to the value of the tank it is listed in appellant's answer as being of the value of $200, but in brief of appellant no question is raised as to the value, the complaint being directed only to the ownership of it. We think the evidence is sufficient to sustain the trial court's finding that the tank was included in the sale by the Illinois Oil Company to appellees and was the property of appellees who took title thereto, and that appellant converted same to its use.

With reference to the two air compressors, Copeland testified that both of them belonged to him and were never owned by the Illinois Oil Company. It appears, however, that both of the air compressors had been in the business and use of the Illinois Oil Company for several years and were included in the sale to appellees. Copeland was present at the time the sale was made and consented and acquiesced in the sale of the air compressors along with the other equipment. If the air compressors did not belong to the Illinois Company, its representatives and Copeland knew the fact at the time of the sale, but Copeland stood idly by and permitted the Illinois Oil Company to sell what he now claims was his property, and checked it in to appellees as a part of the

equipment it had purchased of the Illinois Company, which he admits was done with his knowledge and consent, and after the sale he used the same air compressors in connection with the business of appellant company and never asserted any claim thereto and has not to this time sought possession of them. If it be conceded that the air compressors did belong to Copeland yet, according to his evidence, he and the representatives of the Illinois Oil Company sold them to appellees who took title to them the same as any other part of the equipment, regardless of whether they belonged to Copeland or the Illinois Oil Company. If Copeland has been deprived of the air compressors, it is the result of his own conduct and acquiescence in the sale of them and neither he nor the Illinois Oil Company are or would be in any position to now complain as against the appellees, or deprive them of the property which they purchased in good faith with knowledge and acquiescence of both Copeland and the Illinois Oil Company. In the circumstances we think the evidence is amply sufficient to support the trial court's finding that appellees were the owners of the air compressors and that they were converted to the use of appellant.

Lastly, it is insisted that the value of the property as fixed by the trial court was excessive and not sustained by the evidence. It appears that the value as fixed by many of appellant's witnesses was based upon market values wherever such property might be found without taking into consideration the cost of transportation, installation, etc. Even though the same property might have been purchased elsewhere at a lower figure, yet it should not be overlooked that the cost of transportation, installation, etc., might amount to a large portion of the purchase price. The fact that this equipment was already installed and being used in connection with a business already established must be taken into consideration in fixing its value to appellees.

Furthermore, if it be conceded that the trial court's finding was contrary to the preponderance of the evidence on the whole case with respect to ownership and values, yet it must be remembered that in this sort of action where a jury is waived and the facts submitted to the court, the court is acting as a jury and its finding of fact must be given the same weight as that of a properly instructed jury. It is a well known rule that the courts

will not set aside a verdict of a jury if there is any evidence of a substantial nature to sustain it. Once the proven facts are considered in the light of attendant circumstances, we do not think it could be said that the evidence is insufficient to sustain a jury verdict, had the case been submitted to a jury.

Appellees insist that the judgment should be reversed on their cross-appeal and that they should be allowed to recover extra or punitive damages for the wrongful conversion of their property in addition to the value thereof. While punitive damages may be recovered in such actions upon a proper showing, yet, since the trial court was liberal in its finding as to the value of the property converted and did not deem it proper to allow any extra or punitive damages, in the circumstances we do not feel authorized to reverse the judgment in that respect.

Wherefore, the judgment is affirmed on the appeal and cross-appeal.